UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MINor CHILD, and ) | |
| SHEENA WALLACE, mother, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:18 CV 93 |
| ) | |
| CITY OF GARY, a Municipal Corporation, ) | |
| OFFICER DONALD BRIGGS, OFFICER ) | |
| ANTOINE JAMAL GOFFIN, and OFFICER ) | |
| DEAWN DONTAE KIMBLE, ) | |
| ) | |
| Defendants. ) | |

## OPINION and ORDER

This matter is before the court on a motion for summary judgment filed by City of Gary, Officer Donald Briggs, Officer Antoine Jamal Goffin, and Officer Deawn Dontae Kimble, on all claims brought by plaintiff Minor Child and his mother, Sheena Wallace. (DE # 48.) Also before the court is defendants' related motion to strike. (DE # 61.) For the following reasons, defendants' motion for summary judgment will be granted in part and denied in part, and defendants' motion to strike will be denied as moot.

I. **BACKGROUND**

On November 26, 2016, Minor (then age 16) was an occupant in a stolen vehicle driven by his friend in Gary, Indiana. Police cars appeared behind them with lights activated. Minor's friend did not stop the car immediately, but eventually did so. Minor and his friend got out of the car and ran. Minor claims he did not see anyone following

him, and he hid inside a garage behind the door and put a basket on top of his shoes. Minor claims he was in the garage for about 10 or 15 minutes before anyone discovered him.

According to Minor, a dog then appeared, and started biting him. Minor claims he did not hear anyone outside the garage before the dog entered. According to Minor, the dog bit him on the face and ear. Minor started screaming and turned over on his stomach on the ground. While Minor was screaming, the dog bit his leg and then Minor heard two officers enter the garage. They told him to get down, even though he was already down. Minor then screamed, "I'm only 16, I'm only 16." According to Minor, an officer said, "I don't care," and then one officer tased him and both officers kicked him. The dog stopped biting him after the tasing and kicking started. According to Minor, he did not know the car was stolen and had no idea why the police stopped the car and chased him. Minor was taken to the hospital by ambulance, and had surgery on his ear and stitches on his face. He later received plastic surgery to reconstruct his ear. (DE # 57 at 1-4.)

Officer Briggs was one of the police officers who joined the pursuit of the stolen vehicle occupied by Minor on November 26. Officer Briggs had received information that the car was going at a high rate of speed and that occupants were shooting out of the window. Officer Briggs was accompanied by a police canine named Leo. It is not genuinely disputed that Officer Briggs trained with the canine unit on a volunteer basis

for six months or more before being assigned a canine, completed a six-week canine course, and is continuously required to train with his canine sixteen hours per month.

The officers in pursuit of the stolen car activated their lights upon locating it, and the car fled, causing a high-speed chase. According to the officers, the pursuit lasted for several minutes. The stolen car came to a stop, and both occupants fled on foot. Officer Briggs arrived in the area where the occupants were running, and deployed Leo for an area search. Leo led Officer Briggs to an abandoned garage. Officer Briggs saw Minor's shoes underneath the door.

Officer Briggs claims that he said, two or three times, "Gary Police Department canine, come out with his hands up or the dog will be sent in." (DE # 49 Ex. 1, Briggs Dep. 28:22-25.) According to Officer Briggs, he did not receive a response, so he ordered Leo to apprehend Minor. Officer Briggs claims that Leo entered the garage, located Minor after two sweeps around the garage, and grabbed Minor by the leg.

Officer Briggs, along with Officer Goffin, entered the garage, and Minor yelled "I'm only 16." According to defendants, Minor was on the ground at this point, and Officer Briggs ordered Minor to put his hands behind his back, so Leo could be removed. Defendants claim that after Minor placed his hands behind his back, Officer Briggs grabbed Leo and commanded him to release; Leo complied and Minor was then handcuffed. Both Officer Briggs and Officer Goffin deny tasing and/or kicking Minor. (DE # 49 at 1-4.)

3

Minor and his mother, Sheena Wallace, sued Officer Briggs, Officer Goffin, Officer Kimble (another officer who appears to have played no role in the events other than establishing a perimeter), and the City of Gary, alleging excessive use of force in violation of the Fourth Amendment and loss of familial relations in violation of the Fourteen Amendment, citing 42 U.S.C. § 1983 as the mechanism for the civil action. (DE # 1.) Defendants have now moved for summary judgment on all claims. (DE # 48.) Plaintiffs responded (DE # 57), and defendants replied (DE # 63); defendants also moved to strike certain evidence submitted by plaintiffs (DE #61). The motions are fully briefed and ripe for ruling.

## II. LEGAL STANDARD

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *First Nat'l Bank of Cicero v. Lewdco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts that there is a genuine issue for trial. *Matsushita,*

4

475 U.S. at 587. A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Further, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Id.* at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994).

In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966 (7th Cir. 1998).

### III. DISCUSSION

#### A. Official Capacity Claims

Defendants seek summary judgment on the official capacity claims against the individual officers, as duplicative of the claims against the City itself. This request is legally sound, *see Jungels v. Pierce,* 825 F.2d 1127, 1129 (7th Cir. 1987), and the court grants it.

#### B. Claims against Officer Kimble

Defendants have moved for summary judgment on all claims against Officer Kimble, and plaintiffs agree that such action is appropriate. (DE # 57 at 10.) Accordingly, summary judgment is granted for Officer Kimble on all claims.

5

### C. Fourth Amendment Claims

The crux of plaintiffs' case is the Fourth Amendment excessive force claim against Officers Briggs and Goffin. Defendants seek summary judgment on this claim, first arguing that the officers did not use excessive force or violate Minor's constitutional rights. The use of force against a suspect is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021). When determining the reasonableness of the force used, the court should consider the factors articulated in *Graham v. Connor,* 490 U.S. 386 (1989). *Id.* The *Graham* factors include the severity of the crime at issue, the immediate threat the suspect posed to the safety of the police officers and others, and if the suspect actively resisted or attempted to evade arrest by flight. 490 U.S. at 396. In addition, the court should consider "whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015).

The analysis requires an inquiry into "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397. Courts must examine the reasonableness of the actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* An officer acts reasonably when deploying force if he "has probable cause to believe that

6

the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985). Ultimately, the fundamental question is "whether the totality of the circumstances justified a particular sort of . . . seizure." *Id.* at 8–9.

Defendants have also raised the affirmative defense of qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Marshall v. Allen,* 984 F.2d 787, 791 (7th Cir. 1993). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). The United States Supreme Court holds that if no constitutional right was violated, there is no necessity for further inquiries. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). However, if a violation could be made, the next step is to ask whether the right was clearly established; this inquiry must be undertaken in light of the particular circumstances of the case. *Id.* The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation the officer confronted. *Id.* "A constitutional right is 'clearly established' for qualified-immunity purposes where [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Abbott v. Sangamon County, Ill.,* 705 F.3d 706, 731 (7th Cir. 2013). "A case holding that the exact action in question is

7

unlawful is not necessary." *Alicea v. Thomas,* 815 F.3d 283, 291 (7th Cir. 2016). With respect to qualified immunity, it is clearly established that an officer cannot use more force than is reasonably necessary to execute an arrest. *Phillips v. Cmty. Ins. Corp.,* 678 F.3d 513, 529-30 (7th Cir. 2012).

Because plaintiff alleges two distinct uses of force, first the deployment of the police dog and then the subsequent use of a taser and kicking, the court addresses the potential merits of a Fourth Amendment claim and the application of the doctrine of qualified immunity with respect to each alleged use of force in turn. *Dockery v. Blackburn,* 911 F.3d 458, 467 (7th Cir. 2018); *Deering v. Reich,* 183 F.3d 645, 652 (7th Cir. 1999) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.").

### 1. *Deployment of Police Dog*

The first alleged excessive use of force was Officer Briggs's deployment of Leo into the garage where Minor was hiding. The parties dispute whether Officer Briggs verbally warned Minor that he might deploy Leo. The Seventh Circuit addressed an officer's duty to warn suspects of possible police dog deployment in *Bey v. Cimarossa,* 202 F.3d 272 (7th Cir. 2000). The court stated: "We note that at least one circuit has held that 'failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context.'" *Id.* (citing *Vathekan v. Prince Georges County,* 154 F.3d 173, 179 (6th Cir. 1998)). The Seventh Circuit went on to decide that the district court had erred by crediting the testimony of the officer who claimed to have warned a suspect

8

that he might deploy a police dog, where the suspect oppositely claimed that the warning never occurred. The court ultimately reversed the district court's decision to grant summary judgment on the merits of the Fourth Amendment claim and to grant the officer qualified immunity, holding that whether the officer did actually offer a warning was material to resolution of both questions. *Id.*

This court will not commit a similar error by granting summary judgment or qualified immunity with respect to Officer Briggs's deployment of Leo. Whether Officer Briggs actually issued a warning beforehand is disputed. At this point, the evidence taken in a light most favorable to Minor could yield the reasonable inference that Officer Briggs deployed Leo without a warning against a non-resisting or passively resisting suspect in violation of the Fourth Amendment, so summary judgment on the issue is inappropriate, as is any decision regarding qualified immunity.

The court notes that defendants rely heavily upon *Johnson v. Scott,* 576 F.3d 658, 661 (7th Cir. 2009), in which the Seventh Circuit held that reasonable force was employed when a police dog apprehended a suspect who was fleeing on foot after a car chase, and no verbal warning about the dog was given beforehand. However, the Seventh Circuit noted that under the circumstances of the case (a fast-paced situation involving a suspect who was actively running on foot away from a car chase, only to suddenly halt, turn around, and attempt to surrender), the officer had no real opportunity to issue a warning, nor would a warning have made any difference. *Id.* The Seventh Circuit noted that, in any event, the suspect-plaintiff had not even argued the

9

point. *Id.* Presumably, then, any commentary on the issue of warning in *Johnson* is dicta, and even if it were not, the case at hand is hardly comparable. At most, *Johnson* might support an argument that a warningless dog-deployment could have been reasonable while Minor was racing away from Officer Briggs on foot after exiting the stolen car. However, as the circumstances change, so must the officers' calculation of the reasonableness of actions to be taken. *Smith,* 10 F.4th at 725 ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.") (quotation marks omitted); *see also Strand v. Minchuk,* 910 F.3d 909, 915 (7th Cir. 2018) ("[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity") (quotation marks omitted). Once Minor was no longer actively fleeing, but merely passively hiding in the garage, the situation became less like *Johnson* and more like *Bey*, where there was ample opportunity for a warning to be issued with potential meaningful effect. Whether that warning occurred and the overall reasonableness of the use of a police dog in this context remains to be determined.

      2.    *Use of Taser and Kicking*

Plaintiffs also allege that Officer Briggs and Officer Goffin employed excessive force when they tased and kicked Minor after Leo's deployment. According to plaintiffs, after Leo bit his face and ear, Minor turned onto his stomach on the ground and began screaming, "I'm only 16, I'm only 16." Then, according to plaintiffs, an officer said "I don't care," and then one of the officers tased Minor and both of them kicked

10

Minor while he was screaming. According to plaintiff, Leo did not stop biting him until after the tasing and kicking began.

It is "clearly established that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." *Alicea,* 815 F.3d at 292; *Abbott,* 705 F.3d at 733 ("Permitting substantial escalation of force in response to passive noncompliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts."*).* In the context of this situation, the use of a taser and/or kicking a non-resisting or passively resisting suspect would constitute excessive force. *See, e.g., Dockery,* 911 F.3d at 467 ("an officer may not use significant force (like a Taser) against a 'nonresisting or passively resisting' subject"); *Johnson v. Rogers,* 944 F.3d 966, 970 (7th Cir. 2019) ("[T]here is no doubt that an unnecessary kick, after a suspect is under control, violates the suspect's clearly established rights."); *Abbott,* 705 F.3d at 733 (officers could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders).

The evidence, viewed in favor of Minor, demonstrates that, after Leo had apprehended Minor, the officers kicked and tased Minor despite the fact that Minor was on his stomach, was not resisting, and was already in Leo's grasp on the ground. A reasonable jury could find that the officers knew that Minor did not pose an immediate threat, yet proceeded to use force in the form of kicking and tasing. Therefore, summary

11

judgment must be denied on the issue of the reasonableness of the use of tasing and kicking in this case.

Similarly, the court must reject defendants' request that the court find that the officers are entitled to qualified immunity with respect to the alleged use of a taser and kicking. Qualified immunity protects officers even when they err, so long as the conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Marshall,* 984 F.2d at 791. However, as explained above, it was clearly established at the time of the incident that using a significant level of force like tasing or kicking on a non-resisting or passively-resisting individual constituted excessive force. *See, e.g., Abbott,* 705 F.3d at 733. If the court views the facts in a light most favorable to plaintiffs, as it must in the context of the present motion, then Minor was tased and kicked while he was not resisting in violation of clearly established law. Accordingly, the officers are not entitled to qualified immunity at this phase of the proceedings. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (rejecting claim of qualified immunity where officers used force against a suspect who posed no threat and did not resist).

### D. *Monell* Claims

Defendants also seek summary judgment on plaintiffs' claim against the City of Gary under *Monell v. Department of Social Services,* 436 U.S. 658 (1978). In that claim, plaintiffs argue that the municipality is liable for its failure to train its officers with respect to the use of a police canine. Defendants' primary argument in seeking

12

summary judgment on this claim is that the City of Gary cannot be liable under *Monell* for failure to train when there has been no violation of Minor's constitutional rights. *See Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007). Obviously, this argument fails because, as explained above, there are genuine issues of material fact regarding whether a violation of Minor's constitutional rights occurred.

Defendants next argue that they are entitled to summary judgment because plaintiffs cannot demonstrate deliberate indifference on the part of the City. Under *Monell*, a municipality will be held liable for failure to train its officers adequately only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence." *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 407 (1997). Deliberate indifference can be found on the part of policymakers only when such indifference may be considered a municipal policy or custom. *Canton,* 489 U.S. at 389.

As the Seventh Circuit Court of Appeals explained in *Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007), deliberate indifference may arise in either of two circumstances. First, deliberate indifference may be found when a repeated pattern of constitutional violations makes "the need for further training . . . plainly obvious to the city policymakers." *Id.* (quoting *Canton,* 489 U.S. at n.10). Second, a municipality can be said to have acted with deliberate indifference when, in light of the duties assigned to

13

specific officers or employees, "the need for more or different training is so obvious," and the inadequacy "so likely to result in the violation of constitutional rights" that the deficiency exhibits deliberate indifference on the part of municipal policymakers, even in the absence of evidence of a pattern of constitutional violations. *Jenkins,* 487 F.3d at 492 (quoting *Canton,* 489 U.S. at 390). Plaintiffs do not rely on the first theory of proof; indeed, they point to no evidence of a pattern of violations. Therefore, the court is left with the task of determining whether there are genuine issues of fact as to whether the need for more training in this case was "so obvious" and the alleged lack of training "so likely" to result in the violation of constitutional rights, that deliberate indifference can be attributed to municipal policymakers. *Jenkins,* 487 F.3d at 492 (quoting *Canton,* 489 U.S. at 390).

It is rare for a plaintiff to successfully establish municipal liability in the absence of evidence of a pattern of violations. The Seventh Circuit Court of Appeals has acknowledged that the Supreme Court has yet to uphold liability on such grounds. *Flores v. City of South Bend,* 997 F.3d 725, 732 (7th Cir. 2021) ("We realize that the Supreme Court has yet to issue an opinion in which it upholds liability on this ground, but we take the Court at its word that this does not mean it has disapproved the theory."); *J.K.J. v. Polk Cty.,* 960 F.3d 367, 380 (7th Cir. 2020) ("[T]he Supreme Court has yet to confront a case that presents a viable *Monell* claim based on a municipality's failure to act in absence of a pattern.").

14

In this Circuit, few examples of successful non-pattern claims exist, and those that have succeeded involved ample evidence of blatantly apparent shortcomings with respect to training and oversight. For example, in *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004), the Seventh Circuit held that a correctional facility's failure to train its employees on suicide prevention (among other shortcomings) supported *Monell* liability, even without proof of any previous suicides. In that case, the employee who conducted the deceased inmate's intake proceedings had never completed her 90–day orientation program, never reviewed the relevant intake screening instructional video, never read the manual concerning conducting intake screening and identifying and handling potential suicide risks, and never documented that she completed any of the orientation steps. The correctional facility had also condoned the practice of its employees not completing its mental health intake forms. A social worker on staff testified that he did not review the intake forms, a practice which management knew about and permitted. Evidence was also introduced that the facility's head nurse knew that the social worker would obstruct and resist suicide watch referrals.

Overall, the court found that managers in the upper ranks of the organization allowed the disregard of written policies and yet did nothing to ensure that procedures were followed. Given this evidence, the Seventh Circuit concluded that *Monell* liability could be established without any evidence of a pattern or history of prior suicides,

because an inmate suicide was a "highly predictable consequence" of the municipality's failure to act. *Id.* at 929.

Similarly, in *Glisson v. Indiana Department of Corrections,* 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit held that an institution could be liable under *Monell* for failing to adopt protocols for the coordinated and comprehensive medical treatment of chronically ill inmates. That case involved an inmate who, as the result of laryngeal cancer, had a gastrojejunostomy tube in his upper abdomen for supplemental feeding and a permanent opening in his throat for a tracheostomy tube, and used a neck brace to prevent head slumping. The inmate was given uncoordinated medical care described by the Seventh Circuit as resembling "the blind men's description of the elephant"; it involved a long list of different doctors and nurses, none of whom seemed to be in charge of coordination. *Id.* at 375. He died after thirty-seven days of incarceration because of a "deliberate policy choice pursuant to which no one was responsible for coordinating his overall care." *Id.*

Though *Monell* liability is rarely found in absence of evidence of a pattern, the *Glisson* court explained that "there is no magic number of injuries that must occur before [a] failure to act can be considered deliberately indifferent." *Id.* at 382. The court noted that the institution "had notice of the problems posed by a total lack of coordination," but then "despite that knowledge, did nothing for more than seven years to address that risk." *Id.* The court held that, when faced with the facts of the case, a jury could find that the prison knew for certain that its health providers "would be

16

confronted with patients with chronic illnesses, and that the need to establish protocols for the coordinated care of chronic illnesses is obvious," even if there was no proof of a pattern of inmates dying under the institution's care. *Id.* at 382.

The only pieces of evidence plaintiffs cite to in support of their *Monell* claim are long portions of canine policies from other municipalities (specifically, East Chicago and Chicago), apparently in an attempt to demonstrate the deficiencies in the City of Gary's policy or lack thereof. (DE # 57 at 19-22.)[1] It is unclear whether the City of Gary has any written policy on the use of canines, but it would not be reasonable to infer a complete lack of training based upon the (presumed) lack of a written canine policy. To the contrary, it is not disputed that Officer Briggs trained with the canine unit on a volunteer basis for six months or more before being assigned a canine, completed a six-week canine course, and is continuously required to train with his canine sixteen hours per month. Unlike *Glisson* and *Woodward,* this is not a case where a reasonable juror could conclude that the training in this case was so obviously absent and overlooked that deliberate indifference could be attributed to those making policies at the municipal level based on this incident alone, without any evidence of a pattern of constitutional violations.

---

[1] Defendants have moved to strike the East Chicago and Chicago canine policies from evidence, as they were not disclosed to defendants during discovery. (DE # 61.) The court notes the objection, but denies the motion to strike as moot for purposes of summary judgment proceedings, only, as the policies are not dispositive to the issues before the court and make no difference to the court's decision herein.

Further, plaintiffs do not present any evidence or argument regarding how training might have been deficient, nor how any deficiencies might have caused Minor's constitutional injuries. Oddly, plaintiffs' summary judgment response brief presents, instead, a list of questions: "1. What is Police Department Policy for training police canine dogs? 2. What is custom of police department for: (a) Canine chasing adults (b) Canine chasing children (c) When is dog leash used. 3. What is the municipality's training program for canine dog handlers? [etc.]" (DE # 57 at 24.) Plaintiffs argue that defendants' motion for summary judgment "fails to respond to and address [these] questions." (DE # 57 at 24.) But it is not defendants' burden to do so. *Fitzpatrick v. Cath. Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir. 1990) ("There is no requirement that the moving party negate his opponent's claim.").

Rather, summary judgment is the time for *plaintiffs* to present all possible evidence in support of their case to show that a trier of fact could find for them. *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events"). Perhaps this list of questions would have been appropriate to direct at the defendants during discovery, which has long since closed (DE # 37). But listing questions which could have been answered during the discovery process does not create a genuine issue of material fact preventing summary judgment; rather, it simply highlights plaintiffs' inability to meet their own burden at the summary judgment stage.

18

*See Fitzpatrick,* 916 F.2d at 1256 ("The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion.").

As *Glisson* and *Woodward* demonstrate, the successful *Monell* claim premised on a single incident (as opposed to a pattern of incidents) deals with factual circumstances where the danger posed by the lack of training was so obvious and the need for more training so clear that municipal policymakers can be labeled deliberately indifferent. As explained herein, plaintiffs have failed to create a genuine issue of material fact as to whether this is such a case. Accordingly, plaintiffs' *Monell* claim must be dismissed.

  **E.**  **Familial Relations Claim**

Plaintiffs argue that defendants' actions caused Minor's mother, Sheena, to suffer great emotional distress and recurring Multiple Sclerosis episodes following Minor's arrest. Plaintiffs argue that Sheena was deprived of her "liberty interest in family relations, which includes the right to establish a home and bring up children and to control the education of their own, which right includes the right of a child to be raised and nurtured by his parents." (DE # 57 at 27.)

This claim has no basis in law or fact. As a legal matter, "[f]inding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court." *Russ v. Watts,* 414 F.3d 783, 790 (7th Cir. 2005); *Mussa v. Town of New Chicago,* No. 2:19-CV-406, 2020 WL 1956497, at *2 (N.D.

19

Ind. Apr. 23, 2020) (dismissing "familial relations" claim by husband premised upon defendant-officer's alleged use of excessive force against wife). Further, factually, plaintiffs point to no evidence that suggests that any right Sheena may have to raise and nurture Minor has actually been affected. Accordingly, defendants are entitled to summary judgment on this claim.

IV. **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (DE # 48) is **GRANTED in part and DENIED in part,** consistent with this opinion. Defendants' motion to strike (DE # 61) is **DENIED as moot**.

This case is **REFERRED** to Magistrate Judge John E. Martin for settlement proceedings; should those proceedings be fruitless, this case will be set for trial under separate order.

**SO ORDERED.**

Date: September 21, 2021

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT